That leads us to our third case this morning, which is No. 23-11-47, Speck v. Bates. Okay, Ms. Amati. May it please the Court, my name is Brittany Amati and I represent Appellants Speck and Scheller. The Board never should have allowed this interference to proceed for two independent reasons. First, the Bates claims are prohibited by the one-year statutory bar against a party seeking to provoke an interference with an issued patent. Bates made his claims over five years after Speck's 305 patent issued. The only question is whether Bates can take advantage of what this Court has called a limited exception to the statutory time bar on the ground that Bates' post-critical date claims do not differ from his pre-critical date claims in any material limitation. What do you think are the material differences between the pre-critical date claims and what I'll refer to as the copy claim? Thank you, Your Honor. So as we pointed out in our brief, all of Bates' earlier claims all exclude all containment material or any containment layer that incorporates the drug. So they relied on three different pre-critical date claims and these are set forth in our Bates' earlier claims only exclude a containment material atop the drug layer. That means that the later claims are broader because they permit a containment layer that includes the drug. This is a material difference for two reasons. First, as the prosecution history for Bates' earlier claims confirms, during prosecution, Bates added the limitation requiring that the copy claim act on it. And this also says that if a limitation is added during prosecution to overcome copyright, that means it's material? So cases such as Adair v. Carter and this Court's decision in Parks v. Fine say that there's a presumption that the limitation is material where it has been added to address an examiner's rejection. And we believe those cases apply here with respect to that limitation where Bates, during prosecution, stated expressly that the claims require that the Paclitaxel or the drug need not be incorporated into a containment layer for sufficient adherence for delivery and deployment. And emphasized that the prior, instead, emphasized containment of its active drug. And I think there's a second reason here why these differences are material. And that's because, and this evidence was not disputed before the Board, that the difference between excluding a containment layer on top of a drug and excluding all containment layers actually makes a difference to how the products operate. As Speck's expert explained before the Board. Could you envision a device that would infringe one of these claims but not the other? So that's precisely the issue here. So Bates' earlier claims were narrower in excluding all containment material. Bates broadened their claims to exclude only contained material atop the drug in an attempt to capture Medtronic's commercial product. So the way that Medtronic's commercial product works here is it includes the drug within an excipient. And the earlier claims excluded, it's undisputed, excluded a containment layer at all, whether it contained the drug or was on top of the drug. Bates thought these broader claims to exclude a containment layer on top as opposed to And if there was one that included the Paclitaxol, it was intermixed with it. Correct. That would infringe one of these sets of claims. I guess the later claims but not the earlier claims. That's certainly Bates' argument here. What do you do with the language from the Berger case? I'm referencing page 982 of 279, Fed 3rd. I'm sure you're familiar with this language. Talking about if all material limitations of the copied claim are present and are necessarily result from the limitations of the prior claims, then the copied claim is entitled to the earlier effective date. That seems to be a one-way test in a way that would indicate that broader claims would not run afoul of 135B. That's the way I read that language. How do you deal with that language? The Berger court did use that language, Your Honor, but I think two things are important here. First, the Berger court recognized, as prior cases had laid out, like the Stilego case, the Corbett case, and the Sitz case, that a claim, in order to avoid the statutory time bar, the applicant must show that the later file claims, quote, does not differ from an earlier claim in any material limitation. That's what Corbett and Stilego say, but I don't know how you can square that with the language that Berger uses here. How do you explain language that seems to say the opposite? I think the language that Your Honor was directing me to is best read in the context of the issue in that particular case, where the issue was that the applicant had narrowed the claim during prosecution, and that was sufficient to resolve the issue. I think the other question that the Berger court was dealing with was whether you need to compare the applicant's two sets of claims, so the pre- and post-critical date claims, or whether you're comparing the patentee's claim with the applicant's claim. The court was making clear that the comparison should be between the pre- and post-critical date claims. I think when reading that in context of the particular issues in that case, that explains why the court stated that, because it was sufficient to resolve the issue. But if you look back at cases like Stilego and Sitz, the court is very clear in those cases. For example, Stilego states, and quote, claims are not for substantially the same subject matter if one of them contains one or more material limitations which are not found in the other. And that is, in your view, the two-way test articulated without reference to the two-way or one-way. That's correct, Your Honor. It requires looking at both sets of claims, the pre-critical date claims to assess, are there limitations in the pre-critical date claims not present in the post-critical date claims? And also looking at the post-critical date claims to say, are there limitations in those claims not present in the pre-critical date claim? Both of those analyses are necessary in order to determine whether there's a material difference. And that makes sense here because you're talking about what it should be a statute of propose to provide patent owners with certainty in their patent rights. And where you have a statute of propose that bars on its face any claims that are past the one-year bar, it makes sense to look narrowly at whether there are, in fact, differences between those claims that are material, whichever way they go, in order to assess whether that judicial exception to the statutory bar should apply. And I think this is further bore out in the CCPA's decisions in Ingray-Fitts as well as in Corbett. In Fitts, the court held that it's necessary to compare the structures recited specifically in the earlier claim with the broader recitations of the later claim, and ultimately concluded that the two claims were not directed to substantially the same subject matter. So in essence, the court there applied a two-way test in Fitts, applying the precedent from Stilego. Similarly, in Corbett, there were four sets of different pre-critical date claims. For the fourth set of claims, the court looked at those claims, and it determined that they were materially different because the earlier claims defined the invention with some particularity, and that was the language that the court used. In other words, the earlier claims were narrower than the later, broader claims. So in both of those cases, or all three of those cases, Stilego, Fitts, Corbett, require looking at both sets of claims to compare them. If we were to hold that the 135b1 bar applied to this interference, should we address the written description issue? If the 135b bar time bar applies, then this interference never should have proceeded in the first place. And so the court doesn't need to address it. So this is what I was thinking. They're separate motions. One is a motion on written description, one is a motion under the 135b1 bar. Do they both have to be addressed? It's not entirely clear to me. So I apologize for that, Your Honor. So they are separate, what the board calls threshold motions. And so under either motion, if this court were to reverse, that means that Bates would not have had what the board called standing in the interference, and it should not have proceeded. And so either issue is sufficient to resolve. But there's a third option, which is that even under the 135b issue, we could remand, presumably if we were to decide the written description issue, that would be the end of the case. So there's different possible outcomes. I think, Your Honor, so this court has said that the 135b comparison of the claims is a legal issue, reviewed Danova. Right. So I think this court could. Right. But in terms of deciding whether or not the application of the two-way test would result in your prevailing, if that were the test that we were to adopt, it seems to me at least conceivable that that would be a question that would lead to a remand. Your brief seems to recognize that because you say you will reverse or remand. That's correct, Your Honor. That is an option as well. It also seems to me that you might want to have consideration of this written description issue. Am I wrong? Why would you not want to have that considered? I mean, you're still going to have an application, right? So the posture is that Bates's application is not an issued patent. And so if this court could resolve the issue on either grounds, however, if the court elects to determine the written description issue, even if it determines that the claims were time barred, we certainly would not oppose that result. On the written description issue, I take it that that is not a Danova issue. That's a factual question on which the board is entitled to a substantial evidence review. Would you agree? That's correct, Your Honor. Okay. And so the question then is, is there enough in the application, the Bates application, to suggest that there is a written description for the smooth surface embodiment, for lack of a better term? And I would wonder, owing, for example, to I think it's, is it paragraph 19, I guess it is, the end of paragraph 19 talking about the balloon, again, to call it embodiment, suggests a smooth or having a smooth or slippery surface. Why isn't that some indication? Admittedly, it's a long application. There are not a lot of references to smooth in it, but that's one of them. Why isn't that enough? Given that the board seized on that and found that that was enough to constitute written description, why isn't that enough? I think when you read the specification as a whole and in context, it's very clear that that is a reference to the balloon before it has been roughened, which is described throughout the specification as the present invention and the specific improvement of the present invention. Where is the best place in the specification? I understand that argument. You made it in your brief. But what was not clear to me is whether the reference to the balloon as smooth, the substance on which the balloon, from which the balloon is made, is smooth and slippery, was necessarily before the roughening. Where is the best reference in the application to the roughening being a step that's taken after the construction of the smooth surface balloon? I would direct your honor to a couple of places in the specification. If you take a look at, and this is Appendix 6060, Paragraph 68 of the specification, it states that the initial surface of the base material prior to roughening... Paragraph 68. Oh, I'm sorry, your honor. Paragraph 68? Yeah. It is so. 68? 68, yes, at Appendix 6060. The specification makes clear where it states, the initial surface of the base material prior to roughening or texturing may be smoother than the desired surface roughness. So there's an acknowledgement there that the starting out surface may be smooth and then it's roughened. And then I would also direct your honor to Paragraph 19 and reading that in conjunction with Paragraph 14, and this is at Appendix 6041 and 6039. At Paragraph 19, it states the balloon material is treated, and that's the important language here, so as to be capable of delivering the bioactive material to the treatment site. And if you take a look at Paragraph 14 where it discusses treatment of the medical device, it states very clearly that you're attaining a desired surface roughness or texturing on the surface of the device by whatever treatment of the surface. And it goes on to say that the degree of surface treatment is controlled to provide sufficient adhesion of the bioactive material to the surface device. One of the techniques that are described in this application for roughening makes sense to me, and I'm not a person with a nervous feminor, so I'm going to give that caveat, but they make sense to me with respect to a metal surface, say, for a stand. But they might not necessarily make sense with respect to a balloon of the materials described in Paragraph 19. Like, for example, the abrading, the etching, the abrasive grit. Is there anything to help explain that? So I think throughout the specification, I believe it's Paragraphs, I think it's 61 through 64, where it discusses the various processes by which the surface can be roughened. It does describe that there's various ways that this can be accomplished, and so there's not one particular, I think the one you referenced, that would be necessary to obtain the roughening. But I think what's important here is that throughout the specification, there is a discussion of the present invention involving applying a roughening to the device surface before the drug is being applied. But doesn't it also suggest that that roughening could be to the stent rather than to the balloon? There is a discussion of both the balloon and the stent, but I think if you look at the specification, it is agnostic as to whether or not it's the balloon or the stent. So there's language in the specification describing it as the medical device broadly, and it goes on to explain that that could be a balloon or a stent, but the medical device is what has a roughened or textured surface in the specification. And so I think if you look at the specification as a whole, particularly looking at the description of the prior and the fact that there was a containment layer and what they were trying to do to overcome that, which is described in paragraph 14 as the specific improvement of the present invention, is to attain a desired surface roughness or texturing in order to approve adhesion of the drug as an alternative to using a containment layer. And that's described in the background of the invention as well as in the summary of the invention. So you've got a little bit of a difficult battle here because of the substantial evidence. And even if the evidence is an equipoise on this new balloon surface, what do you think is your strongest evidence for saying the board's reading, just no reasonable person could interpret it the way the board did? I think the strongest evidence here is if you take a look at paragraph 10 and paragraph 11 of the specification, which describes the issues that were present in the prior art and the issues specifically with using containment material and the problems there. And then you take a look at paragraph 14 in the language, the specific improvement of the present invention entails attaining a desired surface roughness or texturing and then applying the drug to that textured surface. Both of those in conjunction make very clear that the invention that the patentee was seeking to protect here was an invention of applying the drug to a roughened or textured surface as an alternative to using what came before, which was using a containment material. And I see that I am into my rebuttal time. Maybe two minutes for rebuttal. Thank you, Your Honor. Mr. Hartz. Good morning, Your Honor. If it pleases the Court, I'm Blake Hartz here for Bates. I want to talk about 135B first a little bit. But before I do that, both of these are essentially factual questions, whether the differences are material and whether there's written description support. And the record before the Board provides a chance. That's not quite true. I mean, in terms of whether we apply a one-way test or a two-way test, that's a legal issue, right? How you apply the test could be a legal issue, but whether those differences are material or not is a factual statement. That's our position. Okay. But the first question is whether you apply a one-way test or a two-way test. And there seems to be some pretty strong support in the earlier cases for applying a two-way test. And that would seem to make sense in terms of the policy here. Why should an amended claim be broader when the window comparison is a two-way test itself? So what's the rationale for applying a one-way test? Well, I'll push back on what these older cases say. If you look at the Stillego case, some of the... No, but we'll get to that. I'm first asking in terms of the policy of the statute. After all, this exception to the time bar is a judicially created exception, right? And so it's based on policy considerations. And what's the policy consideration that suggests we shouldn't be applying a two-way test to the filings outside the window? That seems on its face not to be very sensible. Your Honor, I would suggest that it's not a judicially created exception. It's in the statute. You can have a claim for substantially the same subject matter. But if it's substantially the same subject matter, that should require you to look at all the differences between the claims, including elements that have been added to the claim and elements that have been subtracted from the claim, right? It's a different way of stating the two-way test. You can't just look at things, whether the things in the new claim actually had support in the old claim. I mean, yeah. You have to look at whether there's also things in the new claim that are missing from the old claim. Why would you have to do that when the statute says substantially the same invention? Well, Your Honor, the materials difference, material differences test gets at that issue. But it doesn't say you have to explicitly walk through this in a two-way comparison. I mean, they just say look at the claim. Okay. So that question there was different. I want to go back to Judge Dyke's question. What is the policy reason why we would only apply a one-way test, given the language of the statute? The policy reason? Yeah. I guess it would be that there's always been this equitable notion, even before the statute existed, that allows you to look to a prior claim. And they may not have been as specific about reading the prior claim forward and requiring support in that way. But I just think the historical practice has always permitted this. Are you aware of any cases where claims were broadened to copy the count in an inference and there wasn't a two-way test applied when Section 135B was invoked? Sorry. What was the first part of that question? So my question was are you aware of any cases that have facts like this one? What makes this case different than some of the prior cases is that the later claim, the post-critical date claim, is broader than the pre-critical date claim. Are you aware of any cases that involve those facts and only apply a one-way test? Well, you could look at Stilego. There's three items in Stilego's claim that aren't in the count, and then they find that that's essentially the same. They say that's the essence. But on materiality, as I recall, Stilego, right? In other words, they weren't saying that you could have a material expansion of the later claim. And that would be okay, which would be true if you had a one-way test. I have the same question that I can just have, which is would the one-way test that you're advocating result in having no bound on how expansive the later claim could be? No, I don't think it would go that far. What would be the way you would address that question? If you say that the one-way test is the correct test for determining whether there's a material difference? Well, a lot of the older cases focus on whether there are patentable distinctions between the two sets of claims. And I don't know that Feral Circuit cases have gone that far, but the older CCPA cases, they talk about whether this is a distinct invention from a patentability perspective. So that would be one way to look at that. And if you apply that kind of situation here, the later claims of Bates involved in the interference had terminal disclaimers entered over these very same claims from the 149 patent that we're relying on as providing precritical date support. So if that's a way to put some more meaning into what materiality means in the context of what this test has been discussed as, that would be one way to get there. If we think there is the two-way test should apply, and that's what our case law has applied, because it's looking at all material differences, why aren't the differences between the claims here material? Well, we put evidence in from expert testimony who looked at them and said, I don't think that these are substantial differences. These are essentially the same. The evidence they pointed to, this commercial embodiment that they say is covered by one set and not the other, we don't agree with that position. We think that what they're... What about holdings, I think it's in Adair, that if a claim is modified to overcome prior art, that by adding a particular limitation, as was the case here, that is a material limitation. Yeah, the cases that I've seen, none of them are doing that when they're looking at the pre-critical date claim. And we went through that in the briefing as defining that as material. If you look at a case like Wetmore, it had a narrow limitation in the pre-critical date claim, and then in the later claims or in the count, that limitation of fusible is no longer included, and so that supports this broadening concept that there can be... It's not a material difference necessarily to have a broader claim later. Did the board say that applying the two-way test, there's a lack of materiality? They said that they applied the test from Berger. Okay, but we've raised questions as to whether the statement of the Berger test is really a statement in a different context than here. But let's assume for the moment that we're past the point and that we hold, in accordance with prior cases and the policy, that there's a two-way test here. My question is, on that assumption, did the board address the question of materiality? They looked at the evidence presented to it, and they said these differences are not material. But applying... That doesn't answer my question. Okay. My question is, did they say applying a two-way test, which they rejected, that there's a lack of materiality? They did not explicitly apply a two-way test, Your Honor. Okay. Yeah. And this relates to a point you asked Judge Bryson about whether remand would be appropriate. I think if you were to decide the two-way test applies, I think it would be in the board's position to make that decision based on the facts in front of it in the first place. So if you were going to change the law or, I guess, restate the law here for them, it would probably be their place to address that in the first instance. And then another point... What's the argument as to why there's a lack of materiality here applying a two-way test? Because they're substantially the same. I mean, that's the testimony that's before the board in Dr. Burns' declaration. He said, you know, a lot of these deal with excluding containment materials or in certain layers. It's basically the same subject matter. I don't think that that is a substantial difference. The same subject matter? Where is that testimony? Dr. Burns, Appendix 3781 to 85. That's where he gets into it. 3781? Yeah. Which specific page? So if you look at 84 to 85, so you have 24 of Dr. Burns' declaration, he says, I understand SPEC is contending these are different, so I don't think that's material. I'm sorry. Which paragraph were you on? Paragraph 24. And I apologize. What page of the appendix are you on? Yeah, 3784. Thank you. It's 42. Thank you. And he talks about the emphasis of the limitations is excluding containment materials or layers, and that's substantially the same in both sets of claims. And if you look at language from cases like Stilego, it talks about the ultimate question is whether the specific difference is a material, and you decide that on the facts of each case. And they talk about the essence of the claim, subject matter. The same sort of thing is in Thompson, substantially the same mechanism, substantially the same result. And so those are the types of standards used, even if you're looking at how to treat this materiality question. A couple points to make on written description. What do you think is your best source for your argument on written description in the application? What should we focus on as the best indication that the smooth surface was, in fact, contemplated? Paragraphs 13, 14, and 19. Okay. Now, 14, I guess it is, is the one that says the present invention and talks about roughening. So that is not helpful to you. Was it the person at the end of that paragraph that talks about the components having smoother, slippery surfaces? Well, the beginning of 14 says the present invention, such as a balloon, is coated with the drug. And it has this whole page where it doesn't talk about anything about the texturing. Right? So none of that is tied to having a texture on the balloon surface. And then it talks about a roughening as part of what's exposed here. I said 14. I meant 19. The end of 19 has the language that struck me as being most problematic for you. Problematic? Yeah. I think 19 supports us. It says maybe made of material of a smoother surface. Oh, I'm sorry. Yes, yes, you're right. You're right. It is 14 that is the problem again. The language, the specific improvement of the present invention, the breadth of that sentence, it seems to be problematic. Yes, you're right. The smooth reference is the most helpful. This application uses the present invention in a number of different ways. It's not always in reference to roughening. You know, if you look at the beginning of 14, it says the present invention is a balloon coated. If you look at the second sentence of the summary, which is on Appendix 60.037, Paragraph 13, in one embodiment it's an expandable balloon to which a bioactive material is applied. There are other aspects where the invention is talking about a method of treatment. The invention is a method of making something. So just using the present invention is not limiting to one specific embodiment or configuration in this case. And what is the distinction that you think, meaning the application as a whole, that the application is drawing between what needs to be roughened and what can be smoothed? Are they talking about the stent versus the balloon? How would you divide the universe of what's rough and what can be smooth? Yes, the explicit examples where there's roughening are all talking about stents in the application. None of the detailed examples talk about roughening the balloon surface. So if you look at drawing the line that way, they're talking about different ways of having the material in the device. And they suggest that roughening the stent surface would be sufficient. Sorry, would be sufficient for the balloon? It suggests that roughening of the stent surface alone would be sufficient, right? Yes, for those embodiments. The claims we're dealing with here aren't actually two stents. It's all about balloon devices. And then one more thing on what you... I'm sorry, could you explain that last comment? Because I'm not sure that I understood that. The claims that we're talking about here... The involved claims talk about a balloon catheter device. They don't talk about a stent. They don't have a stent in addition to the balloon, is what you're saying? There may be a few dependent claims that talk about a stent mounted, but the main independent claims we're talking about are all balloon catheter devices. Isn't there a phrase, balloon catheter, that automatically means to a person who is filming art that there's no stent? Is that what you're saying? I understand what you're saying. I'm going back to looking at the claim. The preamble says balloon catheter medical device. So does a person who is filming art understand that to not include a stent? Yeah, I would think... I always thought, and you can correct me if I'm wrong, but from previous cases I thought that the catheter or even a balloon catheter would go through the vein or artery and then the balloon would expand and sometimes there would be an expandable stent around the balloon which would be placed by expanding the balloon and then you reduce the balloon again and the stent stays placed. That is a common procedure, Your Honor. You can also have a procedure where the balloon is inflated and then removed and no stent is placed. Right, but the fact that it says balloon catheter doesn't necessarily mean and no stent. Right. But in these claims that talk about the balloon without mentioning the stent, to the extent that we read the specification saying some part of the structure has to be roughened in those claims, that would seem to mean the balloon since there's no specific mention of the stent. Is that fair? I think so, but I wouldn't agree with you that you should read the specification of the claims that way. But if you were going to say it needs to be roughened, I don't think that there's another way to get there. Some of the independent claims just have a balloon listed. The only other thing I was going to mention is if you were inclined to remand or do something on the written description other than affirm, I'll point out that the board denied the motion on written description without us having a chance to respond. So I don't think you could outright reverse. We would need to have an opportunity to present our case to the board on that. Thank you. Ms. Imani, you have two minutes. Could you address the remand question, particularly the last point that Mr. Hartz made and also his reference to the expert testimony in Paragraph 24 beginning on 3784? Yes, Your Honor. With respect to the written description issue, I'll start with the expert testimony. If you take a look at Paragraph 24, which counsel pointed Your Honors to, I think there's two things that are notable about that paragraph. It is wholly conclusory in the conclusion. All the experts stated was, I do not see a material difference between these phrases. That was the extent of the analysis. And then the second piece is that the end of that paragraph is essentially applying the one-way test, which we think is erroneous. And so I don't believe that that expert testimony is sufficient to address this particular issue that counsel has raised with respect to a remand. I think if you look in contrast to our expert's declaration, which is at Appendix 6578 and 6579, there's detailed information about the differences between including the drug within a containment layer and including the containment layer atop the drug. And the expert explains why those are material differences in terms of how the product operates, including how Medtronic's commercial product operates. And there was no response to that detailed testimony. Does your materiality argument require reliance on your expert, or do you have a separate argument based on the prosecution history? That's correct, Your Honor. We think either argument shows that these claims are materially different. And Bates' own statements during the prosecution history indicate that there is a material distinction between the pre-critical date claims here and the post-critical date claim. What about Mr. Hartz's suggestion that they didn't have an opportunity to respond to the motion? That's correct, Your Honor. The Board did address written description without receiving full briefing on that issue. Okay. The other point I would just like to make in my rebuttal here is with respect to the policy considerations, in particular, that the Court raised, if there were only a one-way test and an applicant were allowed to essentially broaden their claims, it would allow for the exact type of gamesmanship that we have here, where an applicant can materially broaden the claims and seek to capture subject matter that they didn't originally invent. And here, the applicant … By doing it after the critical date. Correct. That's correct, Your Honor. And the last point that I'll make, and I see that I'm almost out of time, the last point that I'll make is that everywhere where the patent discusses, and this is on the written description issue, discusses the manufacture of the device as opposed to its placement or insertion into a patient, it describes it as applying the drug to a roughened or textured surface. So there may be other descriptions in the patent that don't refer to the surface of the device because it's talking about insertion into a patient, but everywhere where the patent describes the manufacturer and how the drug is ultimately applied to the device, it describes it as being applied to a roughened surface. And with respect to the distinction between the stent and the balloon, if you take a look at paragraph 16, the paragraph is broad in that it states the medical device of the present invention, and it includes roughening. So whether it's the balloon or the stent, and I think Judge Streich, Your Honor, pointed out that if the claims here are only to a balloon, then it's that device that's at issue and must have a roughened surface. Do you think the claims are only to a balloon? Do you think the claims are only to a balloon? But they don't, they're comprising claims. They don't mention a stent, but they are comprising claims. So I will say, Your Honor, that my understanding is that has been Bates's position. It's been what? Bates's position. But we, of course, reserve the right to disagree to the extent that this patent is ultimately issued. And that's that. Unless Your Honors have further questions, thank you. Okay. Members, we thank both counsel. The case is submitted. That concludes our session for this morning.